# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| INDIANA REGIONAL MEDICAL CENTER, )<br>)<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>INTERNATIONAL UNION OF )<br>OPERATING ENGINEERS, LOCAL )<br>95-95A, AFL-CIO, )<br>)<br>Defendant. | Civil Action No. _____<br><br>ELECTRONICALLY FILED |

## COMPLAINT

1. This is an action to vacate an arbitration award ("Award") rendered November 18, 2013 by James Clair Duff ("Arbitrator") and involving International Union of Operating Engineers, Local 95-95A, AFL-CIO ("Defendant" or "Union"). A copy of the Arbitrator's Award is attached as Exhibit "A."

## JURISDICTION AND VENUE

2. Jurisdiction of this Court is based on § 301 of the Labor Management Relations Act.  29 U.S.C. § 185 ("LMRA").

3. Defendant resides in and/or regularly does business within the jurisdiction of this Court.  Venue is proper in this District pursuant to Section 301(a) of LMRA, 29 U.S.C. § 185(a).

## THE PARTIES

4. Plaintiff, Indiana Regional Indiana Regional Medical Center ("Indiana Regional" or "Plaintiff"), is a 162 bed not-for-profit acute care community hospital located in the Commonwealth of Pennsylvania and is an employer within the meaning of Section 2(2) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 152(2).  It operates and regularly does

business primarily from 835 Hospital Rd, Indiana, Pennsylvania 15701.  At all times relevant herein, Plaintiff has conducted business within the Court's judicial district.

5. Defendant, International Union of Operating Engineers, Local 95-95A, AFL-CIO ("the Union" or "Defendant"), is a voluntary association and an unincorporated labor organization engaged in representing employees in collective bargaining with employers and is a labor organization within the meaning of Section 2(5) of the NLRA, 29 U.S.C. § 152(5).

## PROCEDURAL HISTORY

6. Indiana Regional and the Union are parties to a collective bargaining agreement ("Agreement") which became effective on October 1, 2011, and which is due to expire on September 30, 2014.  The Agreement covers the terms and conditions of employment for a unit of maintenance employees employed in Indiana, Pennsylvania.  A true and correct copy of the Agreement is attached hereto as "Exhibit B."

7. Article 2 of the Agreement, the Management Rights Article, states:

### ARTICLE 2
### MANAGEMENT RIGHTS

Section 2: The Employer (Indiana Regional) reserves the right to establish, revise and administer any and all policies and procedures, relating to training, operations, services, and maintenance; to hire, promote, demote, evaluate, transfer, assign, lay off, for lack of work and recall employees to work; to reprimand, suspend, discharge, or otherwise discipline employees for just cause as the Employer deems necessary or appropriate; . . . .

[Emphasis supplied.]

8. Indiana Regional maintains and enforces an employee handbook (the "Handbook"), a hardcopy of which is given to each new employee at the time of their hire.

9. Among other things, the Handbook includes a Discipline Policy.  This policy provides, in relevant part, that "[a]ll employees are requested and expected to observe

common sense rules of honesty, courtesy, safety, attendance, and attention to their work, and to refrain from any and all action(s) which reflects discredit to [the Employer] and/or the services [it] provides." It further provides that "[e]mployees who engage in conduct demonstrating a deliberate and/or careless disregard for the rights of others . . . shall be terminated[,] . . ." and enumerates "[f]ighting or causing or threatening to cause injury to another person[]" as conduct that will "ordinarily result in immediate termination of [an employee's] employment. . . ." A copy of the Discipline Policy is attached hereto as "Exhibit C."

10. Douglas Clayton ("Clayton") began working for the Employer in May of 1991 and received a hardcopy of the Handbook at the time of his hire.

11. After receiving the Handbook, Clayton executed an acknowledgment form, attesting that he had received a copy of the Handbook and that he would review the contents of the Handbook, including Indiana Regional's Discipline Policy contained therein.

12. Accordingly, Clayton had knowledge of the Discipline Policy and, therefore, knew that Indiana Regional expressly prohibited threats of violence in the workplace.

13. On February 5, 2013, Allen Gray ("Gray"), Journeyman and Shop Steward, and Dan McQuiston ("McQuiston"), Journeyman and Assistant Shop Steward, attended a weekly performance meeting with Clayton and Mark Neurohr ("Neurohr"), Assistant Director of Facilities Management.

14. Following this meeting, Clayton, Gray and McQuiston went into the carpenter shop in order to discuss what was said during the meeting with Neurohr.

15. During this subsequent meeting, Clayton expressed dissatisfaction with the performance of his union representatives, including Gray and McQuiston, as well was dissatisfaction with his overall work situation at Indiana Regional. Clayton then threatened Gray

3

and McQuiston that if he were terminated or lost his job that "someone was going to pay." While making this statement, Clayton intentionally elevated his voice and aggressively pounded his finger on a table saw in a threatening manner.

16. In response, Gray asked Clayton what he was to infer from this statement, but Clayton refused to clarify what he meant.

17. Feeling threatened by Clayton's statement and overall demeanor, Gray and McQuiston became concerned for their own safety, as well as the safety of others. As a result, Gray and McQuiston immediately reported what had happened to Norm Ziemer ("Ziemer"), Director of Facilities Management, and Neurohr.

18. After hearing what had occurred, Neurohr contacted Matt Reading ("Reading"), Director of Human Resources, and asked him to come down to his office so that he could personally speak with Gray and McQuiston.

19. Reading complied with Neurohr's request and, upon arriving at Neurohr's office, joined the ongoing conversation between Neurohr, Ziemer, Gray and McQuiston.

20. Gray and McQuiston then informed Reading that Clayton had threatened them during a private meeting and informed Reading that they were concerned for their safety.

21. Following this meeting, Reading asked Ziemer to contact Clayton and ask him to meet with him and Mike Grimes ("Grimes"), Security Coordinator, in the security office.

22. Once there, Reading informed Clayton that Gray and McQuiston had notified him that they believed Clayton had threatened them by stating that someone is going to pay if he lost his job.

23. In response, Clayton attempted to explain his comment, for the first time, alleging that he meant somebody would have to pay through the legal system if he lost his job.

4

24. After discussing Clayton's statement with him, Reading notified Clayton that he was immediately suspended, pending further investigation into what occurred and what was said during his earlier meeting with Gray and McQuiston.

25. Grimes then asked Clayton to turn over his key and badge and escorted Clayton out of the facility. As a result of the seriousness of Clayton's comments, Grimes took internal measures to secure the safety of Indiana Regional's employees and patients by notifying security guards of the situation and advising them that Clayton was not to be on Indiana Regional's premises while he remained suspended during the course of its investigation.

26. After meeting with Clayton, Reading and Ziemer returned to Neurohr's office. They then contacted Gray and McQuiston and requested that they also return to Neurohr's office.

27. Once Gray and McQuiston returned, Reading notified them that Clayton had clarified his earlier comment by stating that what he had meant was someone would have to pay for his legal representation. Gray then advised Reading that he had previously provided Clayton with an opportunity to clarify his comment and that Clayton refused to do so. Reading then asked McQuiston and Gray to document the conversation that they had with Clayton

28. Pursuant to Reading's request, Gray prepared a short statement detailing the meeting that had occurred between himself, McQuiston and Clayton earlier that day in the carpenter shop.

29. In his statement, which McQuiston signed off on as being a witness to, Gray stated:

> [Clayton] made a **threatening statement** to me (Gray) that I feel the need to bring to your attention. Dan McQuiston and I went into the carpenter shop with him to have a short discussion on the meeting [that had previously occurred with Neurohr]. At that time,

5

> Doug [Clayton] expressed dissatisfaction with his situation, my performance as a representative, and Mark Neurohr's treatment of his situation. During this time he stated that **'if he is terminated or loses his job that someone is going to pay.'** I asked him how I was supposed to take that remark and he did not elaborate. **Out of concern for everyone's general safety, I am reporting this to you**.

(Emphasis added). A copy of Gray's statement is attached hereto as "Exhibit D."

30. Upon receipt, Reading reviewed the statement as part of his investigation into Clayton's conduct.

31. Upon review, Reading became alarmed by both Clayton's initial statement, which Reading believed to be a threat, as well as by Clayton's refusal to clarify his statement, which Reading believed reinforced Clayton's threat.

32. The following day, Reading met with Neurohr to inquire as to whether Neurohr felt threatened by Clayton's statement. Neurohr informed Reading that he did feel threatened by Clayton, particularly since he lived out in the country by himself, and confided in Reading that he had begun to take precautions to ensure his safety.

33. Prior to making a final decision with respect to what level of punishment would be levied against Clayton for threatening Gray and McQuiston, Reading reviewed Clayton's background work record. Upon doing so, Reading realized that Clayton had been operating under a suspension level of discipline at the time that the events of February 5, 2012 took place.

34. Pursuant to Indiana Regional's multi-step progressive discipline policy, termination follows the suspension level of discipline.

35.     Having concluded that Clayton threatened Gray and McQuiston, which resulted in Gray, McQuiston and Neurohr fearing for their safety, Reading believed that Clayton's conduct warranted that he be terminated.

36.     The decision to terminate Clayton was jointly made by Reading and Ziemer and was based not only on the severity of Clayton's violation of Indiana Regional's Discipline Policy, but also on Clayton's previous discipline history.

37.     Following the conclusion of his investigation, Reading met with Clayton on February 12, 2013.  During this meeting, Reading informed Clayton that his employment was being terminated.

## ARBITRATION

38.     Article 12 of the Agreement, entitled "Grievance Procedure," provides a detailed procedure which culminates in arbitration of all grievances

39.     Pursuant to Article 12, Section 8, an arbitrator selected by the parties has "no jurisdiction to act beyond the interpretation and application of the express terms of th[e Agreement]."

40.     Subsequent to his termination, on February 15, 2013, Clayton filed a grievance alleging Indiana Regional unjustly terminated him, in violation of Article 2 of the Agreement.

41.     Arbitrator James Clair Duff ("Arbitrator Duff") was selected by the parties to hear the dispute.

42.     The arbitration hearing was held on September 10, 2013 in Indiana, Pennsylvania.

43.     In its post-hearing brief to the Arbitrator, Indiana Regional argued that Indiana Regional had just cause to terminated Clayton's employment, pursuant to Article 2 of the Agreement.

44.     On November 18, 2013, the Arbitrator issued his Award,[1] (Exhibit A attached hereto), sustaining the grievance and ordering reinstatement of Clayton.  Specifically, the Arbitrator found that Indiana Regional's conclusion that Clayton intended to threaten his co-workers with violence was "an inference too rife with uncertainty to justify the summary discharge of [Clayton]. . . ."  (Exhibit A, 7).  The Arbitrator further held that Indiana Regional's "desire to enforce a 'zero tolerance' policy cannot be allowed to circumvent the need for [Indiana Regional] to prove what [Clayton] said was pointed, more than the vague, cryptic conditional statement it was, at 'someone.'"  (Exhibit A, 7).

45.     In granting the grievance, the Arbitrator improperly stated that Grievant possessed a "magnitude of good service."  (Exhibit A, 7).  This ignores the undisputed evidence that Clayton was operating under a suspension level of discipline at the time the events of February 5, 2012 took place.

46.     In granting the grievance, the Arbitrator ignored the plain and unambiguous language of the Agreement, which expressly affords deference to Indiana Regional ". . . to discharge, or otherwise discipline employees for just cause as the Employer deems necessary or appropriate . . ."  Instead, the Arbitrator relies on facts not established and language not found in the Agreement and ignored the plain language of the Agreement allowing "discharge, or otherwise discipline employees for just cause as the Employer deems necessary or appropriate . . ."

---

[1] Although the Award is dated November 18, 2013, it was postmarked November 23, 2013 and was not received by Indiana Regional until November 25, 2013.

47. Contrary to the Arbitrator's decision that Indiana Regional engaged in the "summary discharge of [Clayton] . . ." the Arbitrator's decision explicitly outlined the in-depth investigation under taken by Indiana Regional.

48. The Arbitrator failed to address the contract language providing the medical center the authority to discipline "as the Employer deems necessary or appropriate."

49. Accordingly, the Arbitrator impermissibly failed to construe or apply the Agreement and impermissibly has dispensed his own brand of industrial justice. As such, the Award thereby exceeds the arbitrator's authority in Article 12, Section 8 of the Agreement and, therefore, does not draw its essence from the Agreement, is unenforceable and should be vacated in its entirety.

50. For the reasons set forth above, the Award is null and void and of no effect.

WHEREFORE, Plaintiff, Indiana Regional, prays:

1. That the November 18, 2013 Award of Arbitrator James Clair Duff be vacated; and

2. That the Court grants such other relief as may be just and proper.

Dated:  December 17, 2013	Respectfully submitted,

JACKSON LEWIS P.C.

s/ *Douglas G. Smith*
Douglas G. Smith
PA ID No. 56834
smithd@jacksonlewis.com
Cory E. Ridenour
PA ID No. 311974
cory.ridenour@jacksonlewis.com
JACKSON LEWIS LLP
One PPG Place, 28th Floor

9

                Pittsburgh, PA  15222
                (412) 232-0404
                (412) 232-3441 *facsimile*

                *Counsel for Plaintiff, Indiana Regional Medical Center*